## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

Andrea Ratfield,                                        Case No. 22-cv-2212 (KMM/DLM)

          Plaintiff,

    v.                                                      **ORDER**

Delta Air Lines, Inc.,

          Defendant.

---

Plaintiff Andrea Ratfield has been a pilot for Defendant Delta Air Lines, Inc. since 2007. Throughout her career, she complained of sexual harassment to Delta but claims her complaints went unaddressed. After voluntarily entering and completing a rehabilitation program for unrelated reasons, Ms. Ratfield tested positive on a random alcohol test. She maintains that it was a false positive and she tested negative on various subsequent tests—yet Delta would not accept her secondary tests despite accepting them for male pilots in similar situations. Ms. Ratfield further alleges that Delta retaliated against her for her complaints of sexual harassment and gender discrimination by subjecting her to unnecessary medical treatment, attempting to terminate her, and demoting her from Captain to First Officer. She sued Delta for violating Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2, and the Minnesota Human Rights Act ("MHRA"), Minn. Stat. § 363A. Delta moved to dismiss her complaint on the grounds that her claims were preempted by both the Federal Aviation Act ("FAA"), 49 U.S.C. §§ 1301–1552, and the Railway Labor Act ("RLA"), 45 U.S.C. § 151 et seq., and also on the grounds that she failed to state a claim for discrimination, retaliation, and

sexual harassment.  For the reasons that follow, the Court grants Delta's Motion to Dismiss in part.

## I.  BACKGROUND

### Regulating Pilots with Substance Abuse Issues

Through enacting the FAA in 1958, Congress created the Federal Aviation Administration ("the Agency") and authorized it to promulgate regulations governing civil aviation safety.  The Agency is directed to "promote safe flight of civil aircraft" by enacting "regulations and minimum standards in the interest of safety."  49 U.S.C. § 44701(a).  The Agency oversees pilot certification and issues medical certificates enabling pilots to fly planes.  *See* 49 U.S.C. §§ 44702, 44703(a); 14 C.F.R. part 67 (medical standards and certification for pilots).  A commercial airline pilot must obtain a First Class Medical Certificate ("FCMC").  *See* 14 C.F.R. §§ 61.23(a), 67.101–.115, 61.23(a)(1).  One of the requirements of obtaining an FCMC is that a pilot must not have an "established medical history or clinical diagnosis" of substance abuse within the last two years.  *Id.* at §§ 67.107(a)(4), (b).

However, the Agency can issue a Special Issuance FCMC to a pilot with a diagnosed substance abuse issue if "there is established clinical evidence . . . of recovery."  *Id.* at § 67.401(a).  An independent Aviation Medical Examiner approved by the Agency is trained to oversee pilots operating under a Special Issuance license.  [Def. Mem. 4, Dkt. No. 42.]  A Special Issuance FCMC may be conditioned "on the results of subsequent medical tests, examinations or evaluations."  *Id.* at § 67.401(d)(2).  Commercial airlines and the Agency have developed an occupational substance abuse program, the Human Intervention and Motivation

Study program, for pilots with substance abuse issues, and participation in the program is often a condition of obtaining a Special Issuance FCMC.  [Def. Mem. 4.]

Delta and its pilots' union negotiated a collective bargaining agreement ("CBA") that governs the terms and conditions of employment for Delta pilots.  The CBA incorporates Delta's Substance Abuse Policy by reference.  [*See* CBA at 27, Ex. 1, Dkt. No. 43-1.]  Delta's Substance Abuse Policy provides that a pilot may be required to undergo a substance abuse evaluation through either self-referral (a "volunteer" pilot), or through company identification (a "non-volunteer" pilot).  [Substance Abuse Policy ("SAP") at 41, Ex. 3, Dkt. No. 43-3.]  If the pilot is diagnosed with substance abuse, they must complete treatment at a mutually agreed upon treatment center.  [*Id.*]  Initial treatment usually lasts five weeks and occurs at Talbot Recovery Campus in Georgia, but a different facility may be used if Delta and the union agree that another placement is warranted by the circumstances.  [*Id.*]  Should a pilot need additional treatment, it typically occurs for ten to twelve weeks at the Metro Atlanta Recovery Residence, also in Georgia.  [*Id.*]

Delta's Substance Abuse Policy incorporates a "Contract A" and a "Contract B."  [*See* SAP at 39.]  As relevant here, pilots who volunteer for substance abuse evaluation and treatment will be offered a "Contract A," which allows them to return to flying, with monitoring, after completing an initial treatment program.  [*Id.* at 42.]  Contract A requires "total abstinence" as a "permanent condition."  [Contract A, Ex. 4, Dkt. No. 43-4.]

If a pilot "uses" alcohol or drugs while on a Contract A, they will be considered having relapsed and usually will have to sign a "Contract B" or "last chance agreement".  [SAP at 42; Def. Mem. 5.]  If a volunteer pilot relapses only one time with alcohol, they "will not be

suspended or terminated." [SAP at 43.] But if they are on a Contract B and violate a term of that contract, that results in permanent termination. [SAP at 43.] Delta's Substance Abuse Policy also provides that "the provisions of Contract A or B may be modified in individual cases" when "unusual circumstances" are present. [SAP at 44.]

### Ms. Ratfield's Employment

Ms. Ratfield has been a pilot since 2003, and Delta hired her in 2007. [First. Am. Compl. ("Compl.") ¶¶ 31–33, Dkt. No. 26.] She is based out of the Minneapolis-St. Paul International Airport. [Def. Mem. 1.] The terms and conditions of her employment are set by the CBA between Delta and the union. [Id.] As a Delta pilot, Ms. Ratfield is subject to the FAA and its implementing regulations, including those governing pilot qualifications and medical certificates authorizing commercial pilots to fly. [Id.]

Ms. Ratfield has been involved with advocating for gender equality in the aviation industry throughout her career. She founded Female Aviators Sticking Together, a non-profit support network for the female pilot community that also provides scholarships for women interested in becoming pilots. [Compl. ¶ 29.] Ms. Ratfield also assisted in drafting Delta's first-ever maternity and nursing policies for pilots. [Id.] And she helped create a Pilot Family Matters Committee for the union to help address sexual harassment and other similar issues she claims are unaddressed by Delta. [Id.]

### Alleged Harassment

Ms. Ratfield's complaint details extensive sexual harassment she experienced while working as a pilot for Delta, starting with when she was hired. For instance, a doctored photograph of her circulated at new pilot training in 2007, depicting a training manager

fantasizing about her.  [*Id.* ¶ 38.]  She reported this to Delta but claims no action was taken. [*Id.*]  And then, when the list of new Delta pilots was sent out after training, her name was circled with the word "actress" and a tongue drawn next to it.  [*Id.* ¶ 39.]  During international flight training that same year, a superior repeatedly called her and showed up at her hotel room in the middle of the night to request that she get a drink with him.  [*Id.* ¶ 40.]  When she declined his requests, this supervisor allegedly demeaned her in the flight deck the next day and made a false report about her performance.  [*Id.*]  She reported this to Delta but again claims no action was taken.  [*Id.*]

In 2011, Delta did not have policies for pilots who needed to nurse while working, so Ms. Ratfield had to pump breast milk on breaks in the flight deck.  [*Id.* ¶ 43.]  One captain who she flew with, who later became a direct supervisor, bragged to other captains about seeing her breasts while she was pumping.  [*Id.* ¶ 43.]  Also in 2011, a captain called her a "princess" and stated that he did not like that she looked so "girly" in her uniform.  [*Id.* ¶ 45.] She reported the incident, but Delta did not take any action.  [*Id.* ¶ 45.]  Around this time, a Delta captain informed Ms. Ratfield that Delta pilots in New York City were speaking about her in a sexual manner.  She complained about this to her manager but claims it was never addressed.  [*Id.* ¶ 42.]

Then, during a layover in 2015, another pilot told her that she needed a "nipple" to finish her drink, came up behind her and groped her breasts, and exclaimed that he found her nipples.  [*Id.* ¶ 46.]  She reported this incident, but no action was taken.  [*Id.*]  The next year, in 2016, several male captains discussed the fit of her uniform pants, with her supervisor using the offensive sexual term "camel toe" to describe the fit.  [*Id.* ¶ 47.]

On many occasions Ms. Ratfield complained to Delta about the alleged harassment (and later discrimination and retaliation) that she experienced.  She reported instances in July 2007, 2008, March 2010, July 2011, August 2015, throughout 2016 and 2017, March 2018, January 2020, February 2020, March 2020, and January 2021.  [*Id.* ¶¶ 40, 41, 42, 45, 46, 54; Pl. Opp'n 25.]  Some superiors agreed with her.  Captain Jim Dwyer sent her an article about sexual harassment in June 2017 and acknowledged that he thought she was being subjected to it.  [Compl. ¶ 52.]  And after complaining to First Officer Crystal Barrois about the harassment, the First Officer "agreed" with her complaints and said that she, too, was "personally sick" of the sexually hostile work environment fostered by Delta.  [*Id.* ¶ 54.]  Yet Ms. Ratfield alleges that Delta's management never addressed her complaints, nor took any remedial action.

### Initial Treatment

Ms. Ratfield was raped during an aviation event in September 2017.  She reported the assault to her supervisor at the time, Captain Scott Monjeau, and told him that she had started drinking to deal with the resulting trauma.  [*Id.* ¶ 55.]  Captain Monjeau encouraged her to voluntarily enter the occupational substance abuse program for pilots that airlines developed in conjunction with the Agency.  [*Id.* ¶ 55.]

Although told it would be a five-week program, upon checking into the Talbott Recovery Center in Atlanta in October 2017, Ms. Ratfield was informed that she could not participate in the five-week program for pilots "due to her gender and the sexually predatory nature of the men in the program."  [Compl. ¶¶ 55, 59.]  Instead, she had to complete an eight-week program.  [*Id.* ¶ 59.]  Allegedly, counselors at Talbott instructed her not to report sexual harassment to Delta and to "just get through it."  [*Id.*]  In mid-November of 2017, she alleges

that Delta's Regional Director, Captain Gregory Cardis, falsely told the counselors and physicians that Ms. Ratfield has a "history" of "violating chain-of-command," and this resulted in her being required to receive twelve weeks of treatment instead of eight.  [*Id.* ¶ 60.]

On December 14, 2017, despite being just weeks away from completing the program, Ms. Ratfield was involuntarily transferred to the Metro Atlanta Recovery Residence ("MARR"), allegedly "to protect her" from certain male patients at Talbott.  [*Id.* ¶ 62.]  She was required to start over and complete another twelve weeks of treatment at MARR.  [*Id.* ¶ 63.]

While at MARR, she had a three-hour meeting with Captain Cardis (Delta's Regional Director), Captain Monjeau, and First Officer Warren Mowry in March 2018 regarding the sexual harassment she was subjected to throughout her career with Delta.  [*Id.* ¶ 65.]  Several months later, she alleges that Captain Cardis admonished her for two hours regarding the complaints of sexual harassment she had made during this meeting at MARR and threatened her employment.  [*Id.* ¶ 69.]

She was discharged from treatment at MARR in March 2018 and had an appointment with the Agency in May 2018 for a Special Issuance FCMC.  [*Id.* ¶¶ 66, 67.]  She returned to flying for Delta.  [*Id.* ¶ 72.]

**The Positive Test**

Ms. Ratfield participated in the required monitoring and testing under her Contract A. On November 19, 2019, her Aviation Medical Examiner ("AME"), Dr. Kozarsky, noted that she was "sober" and there were "no concerns at this time."  [*Id.* ¶ 73.]  Later that day, she was scheduled for a random drug and alcohol test, but it was sent to the wrong address.  She was

rescheduled for a test on November 21, 2019, but when she showed up at the third-party lab, she claims that it did not have the standard Whole Blood Analysis Phosphatidyl Ethanol (PEth) test she was supposed to take. [*Id.* ¶ 73.] As a result, she claims she had to take a non-standard Dried Blood Spot PEth test that is "notorious for its false positive," and violated Delta's policies. [*Id.*]

That test came back positive on November 26, 2019, and Ms. Ratfield was immediately taken off flight status. [*Id.* ¶ 74.] Delta did not rerun the test, and Ms. Ratfield was not given an opportunity for a confirmatory test despite requesting one. [*Id.*] She maintains that the specimen was a false positive and that she had not used alcohol at any time while being on her Contract A. The same day she was notified of the positive test, she returned to the same lab and took another PEth test at a lower detection level. [*Id.*] It came back negative. [*Id.*] The following day, Ms. Ratfield went to a hospital and took a Whole Blood PEth test and a hair follicle test, which can detect the presence of alcohol up to 90 days in the past, and both came back negative. [*Id.* ¶ 77.] She also took a fingernail test, which can detect alcohol up to 180 days in the past, and this test, too, was negative. [*Id.* ¶ 78.] Delta did not accept these tests, despite Delta allegedly accepting, and even requesting, secondary tests from male pilots who tested positive on an initial test. [*Id.* ¶ 77.]

A toxicologist report from a doctor at Emory University in December 2019 stated that the positive test result from November was "in serious doubt." [*Id.* ¶ 83.] Another toxicologist report, from the American Association of Medical Review Officers, stated that "[a]ll of the relevant testing done after the November 21, 2019, indicate alcohol abstinence and point to

the November 21, 2019 PEth as a false-positive result." [*Id.* ¶ 89.]  Delta did not accept these findings.  [*Id.*]

In December 2019, Delta instructed Ms. Ratfield to report to 45 days of retreatment at a facility in Arizona.  [*Id.* ¶ 78.]  As a single mother of two children, she requested that she be allowed to complete treatment in Minnesota instead, and suggested Hazelden Betty Ford.  [*Id.* ¶ 82.]  Her AME, Dr. Kozarsky, allegedly told Ms. Ratfield to just attend retreatment to make it "easy" on herself because she did not "want to go up against big company and big government."  [*Id.* ¶ 85.]

**Intent to Terminate**

On December 27, 2019, Captain Baltera informed Ms. Ratfield that she was being terminated.  [*Id.* ¶ 85.]  In Delta's letter informing her of its intent to terminate her employment (Notice of Intent to Terminate), the company made a series of allegations against her.  [Notice of Intent, Ex. 5, Dkt. No. 43-5.]  The letter claimed that Ms. Ratfield never completed treatment at Talbott and was discharged on December 15, 2017 without successful completion.  [*Id.*]  It also claimed that she refused retreatment at the Meadows facility in Arizona.  [*Id.*]  Ms. Ratfield maintains that she never refused retreatment and simply requested a facility closer to her home.  [Compl. ¶ 86.]  She filed a grievance through her union seeking to have the Notice of Intent to Terminate rescinded because it contained falsities.  [Withdrawal of NOI, Ex. 6, Dkt. No. 43-6.]  Delta held a hearing in February 2020, and on April 30, it withdrew the Notice of Intent to Terminate.  [*Id.*]  The company recommended Ms. Ratfield be placed at retreatment in Hazelden in Minnesota and required her to sign a Contract B or "last chance agreement."  [*Id.*]

**Retreatment**

Ms. Ratfield began treatment at Hazelden on June 1, 2020, and she was discharged on June 29. [*Id.* ¶¶ 105, 113.] She claims that her AME, Dr. Kozarsky, tried to negatively influence her evaluations and treatment at Hazelden. On the day she started treatment, Dr. Kozarsky allegedly contacted her Hazelden counselor to say that Ms. Ratfield "had psychological problems and/or a personality disorder." [*Id.* ¶ 105.] He called back later and allegedly told her counselor that Ms. Ratfield "had really rubbed some people the wrong way" and that Delta was "the good ol' boys club after all." [*Id.* ¶ 106.] Ms. Ratfield repeatedly requested a new AME, before and after these calls. [*Id.* ¶ 108.] She claims that Dr. Kozarsky and Delta resisted her changing AMEs.

She also alleges that several captains at Delta tried to sabotage her treatment at Hazelden. On June 23, Captain Baltera, Captain Monjeau, and First Officer Mowry sent Hazelden part of an alcohol test and alleged it was Ms. Ratfield's, to "convince Hazelden that [she] was lying and not in remission." [*Id.* ¶ 109.] Her counselor's notes reflect several calls from these Delta managers. For instance, the day after sending the positive test, Captain Monjeau called Hazelden back and requested the test they sent be destroyed. [*Id.* ¶ 110.] Ms. Ratfield emailed several executives at Delta to report this and requested to no longer work with the individuals who had called Hazelden and tried to interfere with her treatment. [*Id.* ¶ 111.] A few days later, on June 28, the day before Ms. Ratfield was discharged, Captain Monjeau and Captain Baltera called Hazelden back and told her Hazelden counselor that the counselor "must have misunderstood" the previous call and that "they do not need any test results destroyed." [*Id.* ¶ 112.] But they again encouraged Hazelden to consider the test they

sent as a positive result for Ms. Ratfield.  [*Id.*]  The Hazelden counselor's notes after this call stated that she "let them know that we would continue to use evidence-based practices to help the patient continue with her recovery."  [*Id.*]

Ms. Ratfield received her Special Issuance FCMC from her new AME on July 15, 2020. [*Id.* ¶ 114.]  She claims that she signed the Contract B under duress, to avoid termination, on August 4.  [*Id.* ¶ 124.]  Her union filed a grievance on her behalf challenging the Contract B. [*Id.*]  She returned to active flying status as a Captain and continues to fly for Delta.  [*Id.* ¶ 125.] However, she was demoted from Captain to First Officer in November 2020, allegedly because in January 2020, Delta backdated 25 days and 40 hours from company administrative leave, or "CADM" status, to "SICK" status.  [*Id.* ¶ 128.]  The backdated time was from December 2019, when she was challenging her positive test.

### Comparator Evidence

Ms. Ratfield's complaint includes several examples of male pilots with substance abuse issues and describes how they were treated by Delta to support her claim that Delta discriminated against her on the basis of gender by treating similarly situated male pilots differently than her.

First, she alleges that Delta allowed Captain Michael Perez to take a secondary test after an initial positive test, and, in fact, he was allowed to undergo further testing after a *second* positive test result.  [*Id.* ¶ 75.]  Unlike Ms. Ratfield, Captain Perez was not required to attend retreatment or sign a Contract B "last chance agreement."  [*Id.* ¶ 75.]  During a meeting with Delta's Senior Vice President of Flight Operations, Captain Burns, relating to her grievance

about having to sign a Contract B, he demanded that Ms. Ratfield tell him how she learned of Captain Perez. [*Id.* ¶ 126.]

Second, Delta pilot Michael Rysso was charged with a DUI in 2016, but Delta allegedly did not require him to enter the substance abuse program or sign a "Contract A." [*Id.* ¶ 75.] He only had to be monitored by an AME for two years. [*Id.*]

Third, when Ms. Ratfield was a First Officer, she reported that her instructor pilot, Captain Thomas Ginavan, had been drinking heavily before an international flight and was hungover prior to takeoff. [*Id.* ¶ 142.] According to another Delta captain, Captain Ginavan had been reported before for this behavior, and Delta had not taken any action. [*Id.*] Ms. Ratfield asserts that Captain Ginavan was not placed in Delta's substance abuse program and that he has maintained his seniority. [*Id.*]

Finally, Captain Steve Sullivan contacted Ms. Ratfield in January 2021 to personally inform her that he received a positive urine test, which should have resulted in his immediate termination because he was on a Contract B or "last chance agreement." [*Id.* ¶ 131.] Instead, Delta permitted him to take a secondary test. [*Id.*] He took a secondary test eight days later, it was negative, and Delta accepted it. [*Id.*] Ms. Ratfield emphasizes that Delta refused to let her take a secondary test, and the secondary test she took on her own that Delta refused to accept occurred only five days after her positive test. [*Id.*]

### The Lawsuit

Ms. Ratfield filed three charges with the Minnesota Department of Human Rights: one in August 2020, one in April 2021, and one in June 2021. [*See* Exs. 12–14, Dkt. No. 43.] After receiving right-to-sue letters from the U.S. Equal Employment Opportunity Commission

("EEOC"), she sued Delta in federal court in New York.  [*See* Compl. ¶¶ 19–20.]  Count One alleges Delta retaliated against her in violation of Title VII by "forcing her to undergo faux medical treatment and examinations," and "by attempting to terminate her and demoting her" because of her complaints about a hostile work environment and gender discrimination.  [*Id.* ¶¶ 150–54.]  In Count Two, Ms. Ratfield claims Delta retaliated against her in violation of the MHRA, but the state-law retaliation claim only alleges that Delta retaliated against her "by demoting her."  [*Id.* ¶¶ 155–58.]  Count Three asserts that Delta discriminated against her based on gender in violation of Title VII "by refusing to accept her secondary negative alcohol test results despite accepting" them for "similarly situated male pilots."  [*Id.* ¶¶ 159–62.]  Finally, Count Four alleges that Ms. Ratfield has been subject to ongoing severe or pervasive sexual harassment while employed with Delta in violation of the MHRA.  [*Id.* ¶¶ 163–68.]  Ms. Ratfield also asserts that the CBA does not provide any recourse, including arbitration, for claims of sexual harassment, gender discrimination, or retaliation.  [Compl. ¶ 149.]  After the case was transferred to the District of Minnesota, Delta moved to dismiss Ms. Ratfield's complaint.

## II.  STANDARDS OF REVIEW

Delta moves for dismissal under Rule 12(b)(1) and Rule 12(b)(6).  In deciding whether to dismiss an action under Rule 12(b)(1) for lack of subject matter jurisdiction, the Court must first distinguish between a facial or factual challenge.  *Carlsen v. GameStop, Inc.*, 833 F.3d 903, 908 (8th Cir. 2016).  Delta confirmed at the hearing that it is raising a facial challenge.  In a facial challenge, the district court considers only "the face of the pleadings" and what is necessarily embraced by them.  *Id.*  The plaintiff is entitled to the safeguards she would have

in "defending against a motion brought under Rule 12(b)(6)." *Id.* Accordingly, the court assumes the facts in the complaint are true and takes all reasonable inferences in the light most favorable to the plaintiff when deciding the motion. *Montgomery v. Compass Airlines, LLC*, 98 F. Supp. 3d 1012, 1017 (D. Minn. 2015).

To survive a Rule 12(b)(6) motion to dismiss, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This standard does not require the inclusion of "detailed factual allegations" in a pleading, but the complaint must contain facts with enough specificity "to raise a right to relief above the speculative level." *Id.* at 555. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are not sufficient. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555). In applying this standard, the Court must assume the facts in the complaint to be true and take all reasonable inferences from those facts in the light most favorable to the plaintiff. *Morton v. Becker*, 793 F.2d 185, 187 (8th Cir. 1986); *see Waters v. Madson*, 921 F.3d 725, 734 (8th Cir. 2019). But the Court need not accept as true any wholly conclusory allegations or legal conclusions that the plaintiff draws from the facts pled. *Glick v. W. Power Sports, Inc.*, 944 F.3d 714, 717 (8th Cir. 2019).

## III.    SUBJECT MATTER JURISDICTION

### A. Preemption Framework

Delta contends that Ms. Ratfield's claim of gender discrimination under Title VII and her claims of retaliation under Title VII and the MHRA are preempted by both the FAA and the RLA. Preemption under each statute derives from different sources, and this influences the Court's analysis.

Preemption under the FAA stems from the Supremacy Clause, which declares federal law "the supreme Law of the Land." U.S. Const. art. VI, cl. 2. A federal statute can preempt state law either expressly or implicitly, but because "the FAA does not expressly preempt state regulation of air safety," preemption under the FAA, if it occurs, must be implied. *Ventress v. Japan Airlines*, 747 F.3d 716, 720 (9th Cir. 2014). Delta argues that the FAA preempts Ms. Ratfield's claims through field preemption, a type of implicit preemption that "occurs when federal law occupies a 'field' of regulation so comprehensively that it has left no room for supplementary state legislation." *WinRed, Inc. v. Ellison*, 59 F.4th 934, 945 (8th Cir. 2023) (quoting *Murphy v. NCAA*, 139 S. Ct. 1461, 1480 (2018)). Essentially, the argument goes, Congress evinced an intent to occupy the field of air safety by enacting the FAA and authorizing the Agency to implement regulations that comprehensively govern a pilot's qualifications to fly. Where state-law claims tread into that federally occupied field, they must be dismissed. The resulting question to answer for FAA preemption is whether Ms. Ratfield's claims infringe upon the federally occupied field of air safety.

By contrast, the basis for preemption under the RLA is statutory in nature, and it does not stem from the Supremacy Clause. Congress enacted the RLA to aid in the "prompt and orderly settlement" of labor disputes in the railroad and aviation industries. 45 U.S.C. § 151a. The statute requires disputes arising out of the interpretation of collective bargaining agreements to be resolved through the employer's internal dispute resolution process, and then if that is unsuccessful, through arbitration before an "adjustment board" established jointly by the employer and the union. 45 U.S.C. § 184; *Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 252 (1994). The question to answer for RLA preemption, then, is whether

Ms. Ratfield's claims require interpretation of her CBA and therefore must be brought before the adjustment board rather than a court. The RLA's arbitration requirement can operate to bar both state and federal claims. While the RLA "preempts" state laws and "precludes" federal laws, the analysis is the same. *Sturge v. Nw. Airlines, Inc.*, 658 F.3d 832, 836 n.4 (8th Cir. 2011); *see also Avina v. Union Pac. R.R. Co.*, 72 F.4th 839, 842 n.2 (8th Cir. 2023) (explaining that although the district court used the word "preemption," it was not the correct doctrine because whether the RLA takes precedence over other laws "does not implicate the Supremacy Clause").[1]

Courts are split on whether RLA preemption is a matter of jurisdiction because it stems from statutory text and not the Supremacy Clause. The D.C. Circuit characterizes it as jurisdictional, but the Sixth and Ninth Circuits do not. *Compare Oakey v. U.S. Airways Pilots Disability Income Plan*, 723 F.3d 227, 237 (D.C. Cir. 2013), *with Emswiler v. CSX Transp., Inc.*, 691 F.3d 782, 790 (6th Cir. 2012), *and Alaska Airlines Inc. v. Schurke*, 898 F.3d 904, 922 (9th Cir. 2018). The Ninth Circuit en banc court in *Schurke* referred to RLA preemption as a type of "forum preemption" that *resembles* primary jurisdiction and is akin to referring disputes to arbitration under the Federal Arbitration Act. 898 F.3d at 922.

The Eighth Circuit has on several occasions suggested that RLA preemption is a matter of subject matter jurisdiction. *E.g.*, *Avina*, 72 F.4th at 842; *Hastings v. Wilson*, 516 F.3d 1055, 1058 & n.2 (8th Cir. 2008). *But see Richardson v. BNSF Ry. Co.*, 2 F.4th 1063, 1073–74 (8th Cir.

---

[1]    For ease of reference, the Court will use preemption in the remainder of this Order to refer to the RLA divesting courts of jurisdiction to consider both state-law and federal-law claims. It nevertheless is aware that preclusion, and not preemption, is the more accurate term with respect to federal claims. *See Avina*, 72 F.4th at 842 n.2.

2021) (Colloton, J., concurring) (questioning whether RLA's mandatory arbitration is jurisdictional after the Supreme Court "expressed concern that courts too often mischaracterize non-jurisdictional [statutory] requirements as jurisdictional" in *Arbaugh v. Y & H Corp.*, 546 U.S. 500 (2006)). Though interesting, the Court need not resolve the question in this case because the outcome would be the same regardless of framing. Thus, for purposes of deciding this motion, the Court will assume that the RLA's arbitration provision is jurisdictional and would divest it of subject matter jurisdiction if Ms. Ratfield's claims require interpreting terms of her CBA.

### B. Federal Aviation Act

Although Delta argues that Ms. Ratfield's claims under both Title VII and the MHRA are preempted by the FAA, the Court disagrees that her federal claims are preempted by this statute. As detailed above, FAA preemption stems from the Supremacy Clause and not from a statutory requirement. Delta conceded at the hearing that it could not find any case in which a court held that the FAA preempted Title VII claims, let alone claims under any other federal statute. Yet Delta maintained that the rationale for FAA preemption applies equally to state and federal claims.

This cannot be so. The Supremacy Clause does not apply equally to bar state and federal claims because its text provides that "the Laws of the United States" trumps *state* law, not other federal laws. U.S. Const. art. VI, cl. 2. Field preemption is based upon federalism concerns, and the idea that federal legislation has occupied a field so completely as to implicitly "oust *state* authority to regulate" in that field. *Keller v. City of Fremont*, 719 F.3d 931, 943 (8th

Cir. 2013) (emphasis added).[2]  The same rationale does not apply equally to preclude federal laws.

If Congress had wished to preclude the application of federal anti-discrimination laws to the aviation industry, it could have included this in the text of the FAA or its subsequent amendments, or in the text of the anti-discrimination statutes themselves.  But no such intent can be discerned anywhere within the statutory or regulatory scheme.  The party seeking the protection of preemption—here, Delta—has the burden of establishing it.  *Williams v. Nat'l Football League*, 582 F.3d 863, 880 (8th Cir. 2009).  The Supreme Court has instructed litigants claiming field preemption to "point specifically to 'a constitutional text or a federal statute'" or some "clear congressional command" that does the preempting.  *Va. Uranium, Inc. v. Warren*, 139 S. Ct. 1894, 1901, 1905 (2019) (quoting *Puerto Rico Dept. of Consumer Affairs v. ISLA Petroleum Corp.*, 485 U.S. 495, 503 (1988)).  Here, where there is nothing in the text of the FAA or its regulations indicating an intent to preclude federal anti-discrimination law, and a complete absence of caselaw supporting such a proposition, the Court holds that the FAA does not bar Ms. Ratfield's Title VII claims.

The only state-law claim Delta argues is preempted by the FAA because it relates to air safety is Ms. Ratfield's retaliation claim under the MHRA.  For this claim, Ms. Ratfield contends that she engaged in a protected activity by complaining of sexual harassment and gender discrimination to Delta.  [Compl. ¶ 156.]  She alleges that Delta retaliated against her

---

[2]    Even the Agency's own implementing regulations governing drug and alcohol testing of pilots expressly provide that they "preempt any *State or local* law, rule, regulation, or order" that conflicts with them.  14 C.F.R. § 120.205 (emphasis added).  But those regulations do not mention other federal laws.

by "demoting her" from Captain to First Officer through backdating the time she spent challenging her positive test from administrative leave to sick time, which resulted in her losing seniority.  [*Id.* ¶ 157.]  Because the administrative coding of time off does not implicate safety, nor is regulated by the Agency, this claim is not preempted by the FAA.  Delta's Motion to Dismiss is **DENIED** to the extent it seeks dismissal of any of Ms. Ratfield's claims pursuant to FAA preemption.

### C.  Railway Labor Act

Unlike the FAA, preemption under the RLA is statutory in nature, and not constitutional.  Therefore, it can apply to prevent this Court from considering both her federal and state claims.

Concerned about the interruption of interstate commerce if workers went on strike in the air and rail industries, Congress enacted the RLA to create an orderly and efficient framework for resolving two types of labor disputes in these industries.  45 U.S.C. § 151a; *Union Pac. R.R.  Co. v. Bhd. of Locomotive Eng'rs*, 558 U.S. 67, 72 (2009).  The first type of dispute, (also known as major disputes), are those "concerning rates of pay, rules, or working conditions."  45 U.S.C. § 151a.  Major disputes "relate to the formation of collective bargaining agreements or efforts to secure them."  *Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 252 (1994) (cleaned up).  Both parties agree that this litigation does not concern a major dispute.

The second type of dispute governed by the RLA, deemed "minor disputes," *id.*, "grow[] out of grievances or out of the interpretation or application of agreements" that govern "pay, rules, or working conditions," 45 U.S.C. § 151a.  In other words, minor disputes involve questions about the application of an existing labor agreement to a particular situation.

19

*Hawaiian Airlines*, 512 U.S. at 253 ("[M]ajor disputes seek to create contractual rights, minor disputes to enforce them.") (quoting *Consol. Rail Corp. v. Ry. Labor Execs.' Ass'n* ("*Conrail*"), 491 U.S. 299, 302 (1989)).  A dispute between an individual employee covered by an existing CBA and the airline they work for "is presumed to be minor."  *Schwartz v. IAM Dist. 141*, Case No. 0:17-cv-0717-WMW-KMM, 2018 WL 4473401, at *3 (D. Minn. Mar. 19, 2018), *report and recommendation adopted*, Case No. 17-cv-0717 (WMW/KMM), 2018 WL 2538297 (D. Minn. June 4, 2018).  If Ms. Ratfield's claims amount to minor disputes, this Court is divested of subject matter jurisdiction over them because the RLA requires such disputes to be resolved through internal dispute resolution followed by arbitration before an adjustment board.  45 U.S.C. § 184.

### 1.  Test for RLA Preemption

When, exactly, claims are preempted by the RLA "is a complicated issue marked by somewhat imprecise and often conflicting language."  *Carpenter v. Nw. Airlines, Inc.*, No. CIV.00–2490 ADM/AJB, 2001 WL 1631445, at *2 (D. Minn. June 7, 2001) (quotation omitted).  The clearest guidance comes from the Supreme Court, which has held that the RLA does not preempt "causes of action to enforce rights that are independent of the CBA."  *Hawaiian Airlines*, 512 U.S. at 256.  In *Hawaiian Airlines*, an airline terminated a mechanic after he refused to certify the safety of a plane and he reported his safety concerns to the Federal Aviation Administration.  *Id.* at 248.  Analyzing the text of the RLA, the Court found no clear congressional purpose in the statute "to create a regime that broadly pre-empts substantive protections" offered by the States and the federal government "independent of any negotiated labor agreement."  *Id.* at 256–56.  The Court held that the mechanic's claims asserting

retaliation and violation of a state whistleblower protection act were not preempted by the RLA because the "only source" of the asserted rights was "state tort law." *Id.* at 258, 266. Unfortunately, the Supreme Court has not revisited RLA preemption since *Hawaiian Airlines* in 1994.

The *Hawaiian Airlines* test was straightforward to apply, and initially courts hewed to it. For instance, just months after *Hawaiian Airlines* was decided, the Eighth Circuit held that a flight attendant's state-law disability discrimination claim was not preempted by the RLA. *Taggart v. Trans World Airlines, Inc.*, 40 F.3d 269, 274 (8th Cir. 1994). Quoting *Hawaiian Airlines*, the Eighth Circuit explained that the "only source" of the employee's right not to be wrongfully terminated stemmed from "state law, independent of the collective bargaining agreement." *Id.* at 274. Likewise, in *Deneen v. Northwest Airlines, Inc.*, 132 F.3d 431, 438 (8th Cir. 1998), the Eighth Circuit held that pregnancy discrimination claims brought by an airline agent were not preempted because "federal and state law are the source of the claims," and they arose "independent of the collective bargaining agreement." *But see Gore v. Trans World Airlines*, 210 F.3d 944, 949–50 (8th Cir. 2000) (finding tort claims preempted because the CBA was the "defining source of the duties" at issue for determining liability of the employee's claims). Similarly, on multiple occasions, the Eighth Circuit held that the RLA did not preclude airline employees' ADA claims because they sought "to enforce a federal statutory right, not a contractual right embodied in the collective bargaining agreement." *Benson v. Nw. Airlines, Inc.*, 62 F.3d 1108, 1115 (8th Cir. 1995); *Fenney v. Dakota, Minn. & E. R.R. Co.*, 327 F.3d 707, 718 (8th Cir. 2003); *Pittari v. Am. Eagle Airlines, Inc.*, 468 F.3d 1056, 1060–61 (8th Cir. 2006). Courts in this district followed suit and examined the source of the right. *See, e.g.,*

*Gilmore v. Nw. Airlines, Inc.*, 504 F. Supp. 2d 649, 656 (D. Minn. 2007) (FMLA claim not preempted); *Roslyn v. Nw. Airlines, Inc.,* No. 05–0441 (PAM/RLE), 2005 WL 1529937, at *2–3 (D. Minn. June 29, 2005) (Uniformed Services Employment and Reemployment Rights Act claim not preempted).

Over time, however, this clarity faded. Courts began to emphasize certain language from *Hawaiian Airlines* to find a broader swath of claims preempted under the RLA. Though the Supreme Court's test rested upon the legal character of the claim, and whether the source of the right existed independently of the CBA, the Court in *Hawaiian Airlines* also cited with approval its precedent analyzing preemption in the context of the Labor-Management Relations Act, 29 U.S.C. § 185 ("LMRA"). 512 U.S. at 262–63. It summarized that authority, explaining that state-law claims are only preempted under the LMRA if they are "dependent on the interpretation of a CBA," *id.* at 262 (citing *Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399 (1988), and "can be 'conclusively resolved' by reference to an existing CBA," *id.* at 263 (quoting *Conrail*, 491 U.S. at 109). The Court concluded that preemption analysis under the RLA and LMRA ought to use the same framework. 512 U.S. at 263.

In recent years, courts have seized upon that language—regarding whether a claim is **dependent upon the interpretation of a CBA**—to find claims preempted where analyzing the elements of the plaintiff's claim would require interpreting any term of their CBA. In *Boldt v. Northern States Power Co.*, 904 F.3d 586 (8th Cir. 2018), the Eighth Circuit determined that the plaintiff's disability discrimination claim was preempted because his prima facie case would require the court to resolve a dispute between the plaintiff and his employer as to whether he was fit-for-duty under the terms of the CBA and incorporated federal regulations. The

plaintiff claimed that he was qualified; his employer disagreed.  *Id.* at 592.  The *Boldt* court found that this disagreement, and the interpretation of CBA terms it compelled, required dismissal even though the substantive protections the plaintiff was seeking to vindicate came from state law and not the CBA.  *Id.* at 592–93.

Similarly, in *Johnson v. Humphreys*, 949 F.3d 413 (8th Cir. 2020), the Eighth Circuit found the plaintiff's race discrimination claim preempted by the RLA because he would have to prove that he "was meeting the legitimate expectations of the employer" as part of his prima facie case.  *Id.* at 416.  Proving this, in turn, would require the plaintiff to show that he was following all the practices and rules of the CBA, and particularly that the offense he was purportedly fired for did not amount to an offense of "extreme seriousness," which was a term "unique to the CBA."  *Id.* at 416–17.

Most recently, the Eighth Circuit affirmed dismissal of an employee's failure-to-promote claims under federal anti-discrimination laws because to make out a prima facie case, she would have to prove that she "was qualified *and applied for*" the promotion. *Avina*, 72 F.4th at 843 (emphasis in original).  The parties disagreed as to whether she applied, and resolving that dispute, the court concluded, would depend upon what it meant to "apply" under her CBA.  *Id.* at 844.  These cases illustrate how the test for RLA preemption has moved from one based solely upon the legal character of the claim to one that also considers whether any term of the CBA would be implicated by the court's analysis.

What results is a two-part test, with one part largely swallowing the other in contemporary application.  Now, the RLA operates to bar two types of claims: (1) those "founded directly on rights created by" the CBA, and also (2) those claims "substantially

dependent on analysis of" the CBA. *Boldt*, 904 F.3d at 590 (quoting *Caterpillar Inc. v. Williams*, 482 U.S. 386, 394 (1987)).  What it means for a claim to be "substantially dependent" upon the interpretation of a CBA is less than pellucid.  *Boldt* suggests that it "requires the interpretation of some specific provision" of a CBA.  *Id.* at 590 (quoting *Meyer v. Schnucks Mkts., Inc.*, 163 F.3d 1048, 1051 (8th Cir. 1998)).[3]  Some courts assess whether the claim at issue is "inextricably intertwined" with terms of the CBA.  *Gore*, 210 F.3d at 949; *Markham v. Wertin*, 861 F.3d 748, 755 (8th Cir. 2017).  Still others ask if the claim can be resolved without interpreting any terms of the CBA.  *Richardson v. BNSF Ry. Co.*, 2 F.4th 1063, 1068 (8th Cir. 2021).[4]

Even in this murky caselaw, some bright lines can be discerned.  Disputes involving "purely factual questions about an employee's or employer's conduct and motives" do not count as being substantially dependent upon the CBA.  *Avina*, 72 F.4th at 839 (cleaned up); *Hawaiian Airlines*, 512 U.S. at 261; *Gore*, 210 F.3d at 949.  Nor does the mere need to reference or consult a CBA require preemption.  *Markham*, 861 F.3d at 755; *Gore*, 210 F.3d at 949.  It appears that there must be an active and genuine dispute about a specific CBA term for the

---

[3]    Ironically, in *Meyer*, where this language stems from, the Eighth Circuit discussed its "conflicting precedents" in RLA/LMRA preemption and recognized that "some of our cases do not seem to have applied [Supreme Court precedent] in an appropriately narrow way." 163 F.3d at 1050.  There, the Eighth Circuit chose to follow "the narrower approach to LMRA preemption, which asks only whether the claim itself is necessarily grounded in rights established by a CBA," because that approach is "more faithful" to Supreme Court precedent. *Id.* at 1051.

[4]    This formulation strikes the Court as inverting the Supreme Court's language in *Hawaiian Airlines*, which stated that a claim is preempted if it can be "conclusively resolved" by interpreting a CBA.  512 U.S. at 263, 265.  Whether interpreting the CBA resolves the claim is meaningfully different from whether a claim can be resolved without interpreting the CBA.  Under the latter formulation, many more claims would be preempted.

plaintiff's claim to "substantially depend" upon interpreting the CBA.  *See Boldt*, 904 F.3d at 592 (dispute over whether plaintiff was "fit for duty"); *Johnson*, 949 F.3d at 417 (dispute over whether offense was one of "extreme seriousness"); *Avina*, 72 F.4th at 843–44 (dispute over whether plaintiff "applied" for the promotion); *see also Sturge v. Nw. Airlines, Inc.*, 658 F.3d 832, 838 (8th Cir. 2011) ("Interpretation of a provision of a collective bargaining agreement entails the resolution of a dispute about the meaning of the provision.").  And the Eighth Circuit has determined, based on Supreme Court precedent, that it is not enough for an employer to assert that their conduct was "arguably justified" by the CBA to render the plaintiff's claims preempted.  *Sturge*, 658 F.3d at 838–39 (explaining that the Supreme Court used the "arguably justified" standard for differentiating between major and minor disputes, and not whether a claim is preempted).

### 2.  RLA Preemption in This Case

With that background in place, the Court applies the test for RLA preemption to Ms. Ratfield's claims.  The proper place to start in determining whether her gender discrimination and retaliation claims are preempted by the RLA is identifying what, exactly, the claims require her to prove.  *Boldt*, 904 F.3d at 590.

**Gender Discrimination**

The parties agree that without direct evidence of gender discrimination, Ms. Ratfield must ultimately prove her claim with circumstantial evidence using the familiar *McDonnell Douglas* burden-shifting framework.  *Id.* at 591 (citing *McDonnell Douglas Corp v. Green*, 411 U.S. 792 (1973)).  To establish a prima facie case of gender discrimination under Title VII, Ms. Ratfield must show that "(1) she was a member of the protected group; (2) she was

qualified to perform the job; (3) she suffered an adverse employment action; and (4) circumstances permit an inference of discrimination." *Bell v. Baptist Health*, 60 F.4th 1198, 1203 (8th Cir. 2023) (quoting *Bearden v. Int'l Paper Co.*, 529 F.3d 828, 831 (8th Cir. 2008)).

Delta maintains that the second, third, and fourth prongs "substantially depend" upon provisions of the CBA.  The Court disagrees as to the third and fourth prongs.  Determining whether Ms. Ratfield plausibly alleged an adverse employment action does not substantially depend upon interpreting the CBA.[5]   As to the fourth prong, concerning whether circumstances permit an inference of discrimination, Delta's arguments conflict with Eighth Circuit authority.[6]

However, the Court does agree with Delta as to the second prong.  Determining whether Ms. Ratfield was qualified at the time she was allegedly discriminated against depends upon an active and genuine dispute over specific terms in the CBA.  Ms. Ratfield maintains that she was qualified at the time of the allegedly discriminatory act because she was flying planes for Delta when she took the test, and the "Pilot Qualifications" section of the CBA

---

[5]    Ms. Ratfield alleges that she was demoted because of Delta's disparate treatment of her compared to similarly situated male pilots.  [Compl. ¶ 161.]  This is objectively an adverse action under longstanding Eighth Circuit precedent.  *See Shockency v. Ramsey Cnty.*, 493 F.3d 941, 950 (8th Cir. 2007) (describing "demotions" at the far end of the spectrum of actionable action, along with suspensions and terminations).

[6]    Delta argues that analyzing whether circumstances permit an inference of discrimination requires interpreting the CBA because (1) it complied with the CBA in its treatment of Ms. Ratfield, and (2) assessing her comparator evidence would require interpreting CBA terms.  But the Eighth Circuit has already rejected these exact arguments.  In *Sturge*, the court agreed with the plaintiff that assessing comparator evidence "requires at most mere reference" to the CBA and not an interpretation of disputed terms, and that an airline claiming its treatment of plaintiff was "arguably justified" by the CBA as a defense to its employee's claims is insufficient to compel preemption.  658 F.3d at 838–39.

only references a requisite number of flying hours, which she had, and not positive alcohol tests. [*See* Ex. B to Valli Aff., Dkt. No. 46-2.] Delta replies that the CBA incorporates by reference the Contract A agreement she signed, and specific provisions in the Contract A show that she was not qualified to be a Delta pilot at the time of her positive test.

For instance, Ms. Ratfield's Contract A states that she "will be subject to random testing for an additional 24 months" and that "[t]he requirement for total abstinence will be a permanent condition of [her] holding an Airman's Medical Certificate." [Contract A, Ex. 4, Dkt. No. 43–4.] As part of this contract, Ms. Ratfield agreed "to completely abstain from any mood altering drugs (alcohol, sedatives . . . etc.) on or off duty." [*Id.*] She acknowledged that if she consumed "any alcohol or drugs (other than those prescribed by [her] physician) during or after the period of [her] monitoring, on or off duty, [her] Airman's Medical Certificate will be immediately invalidated" and she would "not act as the pilot of any Delta aircraft." [*Id.*] Further, the Contract A specifies that "strict compliance with all these provisions is mandatory, and noncompliance with any responsibility . . . may result in disciplinary action, up to and including termination by Delta." [*Id.*]

Admittedly, it is a close call whether the question of Ms. Ratfield's qualification for the job depends on the CBA. On one hand, it seems untenable for Delta to claim Ms. Ratfield was not qualified to be a pilot at the time of the positive test in November 2019, because she continued to be employed by Delta as a pilot throughout this entire period. But on the other hand, the dispute seems to boil down to whether abstinence is the same as not receiving a positive test. The question is whether her initial positive test, which she claims is a false positive, violates Contract A's insistence on "total abstinence" and her agreement to

27

"completely abstain from" alcohol and not "partake of any alcohol or drugs." While the Court thinks Ms. Ratfield has the better interpretation—that abstinence is not equivalent to no positive tests because she could have been abstinent yet nevertheless test positive—answering this question involves an active and genuine dispute about specific terms incorporated into the CBA. The Court would be required to resolve this dispute by interpreting those terms for Ms. Ratfield to establish a prima facie case, and RLA preemption precludes the Court from doing so. This conclusion finds support in *Boldt* and *Johnson*, where the Eighth Circuit found similar claims preempted because of disputed CBA terms implicating the qualified prong of the prima facie case under the *McDonnell-Douglas* framework.

Ms. Ratfield emphasizes that she is not disputing terms within the CBA or claiming that the terms themselves are discriminatory. Instead, she's claiming that Delta applied those terms in a discriminatory manner. [Pl. Opp'n 27–31.] The central question, she contends, is not whether Delta adhered to the terms of the CBA, but whether it treated pilots differently on the basis of gender when it applied that CBA. Ms. Ratfield cites persuasive caselaw from other circuit courts holding that disparate treatment claims under Title VII are not preempted by the RLA. For instance, in *Carmona v. Southwest Airlines Co.*, 536 F.3d 344 (5th Cir. 2008), the Fifth Circuit reversed the district court's determination that a male flight attendant's gender discrimination claim was preempted.

> As provisions of the CBA are relevant to, but *not* dispositive of, the resolution of Carmona's claims, his claims do not constitute a minor dispute under the RLA. Even though a court would have to *refer to* the CBA to consider fully each of the alleged acts of disparate treatment, there is no disagreement about how to interpret these provisions of the CBA that detail Southwest's procedures for assessing attendance, leave, discipline, and termination. . . . He alleges that CBA procedures were *applied* in a discriminatory manner, not that CBA procedures

were fundamentally discriminatory. Thus, consideration of the CBA *as applied to Title VII and the ADA*—not interpretation of the CBA itself—is what is required to resolve Carmona's claims.

*Id.* at 349–50; *see also Hukman v. Am. Airlines, Inc.*, 796 F. App'x 135, 140 n.4 (3d Cir. 2019) (agreeing that plaintiff's Title VII claims were not precluded by the RLA because their resolution "centrally requires analyzing her conduct and American's conduct and motives; Hukman does not challenge any provision of the CBA as discriminatory").

The Sixth Circuit similarly has held that an employee's race discrimination claims were not preempted by the RLA because he did not dispute the CBA policies but rather "argued that the assignment and disciplinary procedures were applied to him in a discriminatory manner." *Yelder v. Norfolk S. Ry. Co.*, No. 21-1141, 2022 WL 18587845, at *2 (6th Cir. Aug. 12, 2022). The *Yelder* court agreed with the district court's conclusion that the factfinder would need to refer to the CBA but not interpret it because "neither party disputes the terms," and instead disputes whether those terms were applied in a discriminatory manner. *Id.*

The Seventh Circuit has also concluded that the RLA did not preempt a female employee's Title VII claim against a railroad on similar grounds. *See Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 832–34 (7th Cir. 2014).

> In this case we must fit Title VII claims into this framework, taking care not to interpret the RLA as excluding a class of employees from statutory protections against employment discrimination and retaliation.
>
> . . .
>
> Even if Carlson did not have the qualifications specified in the collective bargaining agreement, she would still have viable Title VII claims if, as she alleges, the same potentially disqualifying attributes have been overlooked for men or for others who have not complained about discrimination.

*Id.* at 832–33.   Because the plaintiff's CBA did not expressly prohibit discrimination or retaliation, the Seventh Circuit chided the employer for "making a truly radical argument: that [she] cannot assert *in any forum* her right to be free from sex discrimination and retaliation." *Id.* at 834.   The court saw "no reason to apply the RLA" in that way.   *Id.*

At the hearing, Ms. Ratfield's counsel stated that like the plaintiff in *Carlson*, her CBA provides no prohibition of or recourse against discrimination or retaliation.   Her counsel explained that Ms. Ratfield's union would not bring a disparate treatment claim before the adjustment board because it would create a conflict of interest for the union to point out that some of its members were treated better than Ms. Ratfield (perhaps in violation of the CBA). As further support for the allegation in her complaint that the CBA provides no recourse for discrimination, Ms. Ratfield provided a letter from the pilots' union, ALPA, in a different case, in which it explained to the federal judge that individual rights flowing from Title VII are "nowhere addressed in ALPA's collective bargaining agreement" and because they are "outside the RLA," the union "therefore has no representative authority or role" in resolving those claims.   [*See* ALPA Letter, Ex. C to Valli Aff., Dkt. No. 46-3; *see also* Compl. ¶ 149.]

Frankly, the Court shares Ms. Ratfield's concerns.   Ms. Ratfield's claims are much like the plaintiff's claims in *Carlson*, *Carmona*, *Hukman*, and *Yelder*.   She is not challenging terms in her CBA or alleging that the terms themselves are discriminatory; rather, she argues that Delta applied those terms to her in a discriminatory manner as compared to employees who are not in a protected class.   Like the Seventh Circuit, this Court is concerned with leaving certain workers without any forum or recourse to challenge unlawful discrimination by interpreting the RLA "as excluding a class of employees from statutory protections" that they are entitled

to under federal law.  *Carlson*, 758 F.3d at 832.  And federal courts that decide Title VII cases every day seem well suited to evaluate claims of disparate treatment concerning several workers or classes of workers.

This is where downsides to hitching RLA preemption to the test established in the LMRA context become apparent, and where the distinctions between the two statutes become meaningful.  *See Hawaiian Airlines*, 512 U.S. at 263 n.9 (recognizing that the RLA and LMRA have different "language, history, and purpose[s]").  The LMRA creates a federal cause of action for controversies arising out of CBAs, and the consequence of LMRA preemption is whether the suit must be brought in *state* or *federal* court, not court or arbitration.  *See* 29 U.S.C. § 185(a); *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 208 (1985); *Williams*, 582 F.3d at 873–74. Although courts analyze preemption under the LMRA and the RLA by asking the same question (does the claim depend upon interpretation of the CBA?), the consequence of preemption under each statute is meaningfully different.  Regardless of how the LMRA preemption question shakes out, the plaintiff still has a judicial forum in which to bring discrimination claims—even when a CBA is implicated.  By contrast, the RLA compels arbitration before an adjustment board in the rail and air industries, and a finding of preemption under the RLA essentially insulates discrimination claims from judicial review altogether (if the union will even bring such claims in the first place, as discussed above).[7]

---

[7]     Judicial review of adjustment board decisions under the RLA is limited to narrow circumstances: when the board's decision (1) fails to comply with the RLA, (2) exceeds the board's jurisdiction, (3) comes from fraud or corruption, or (4) violates due process.  *Sullivan v. Endeavor Air, Inc.*, 856 F.3d 533, 537 (8th Cir. 2017); *see also Atchison, Topeka & Santa Fe Ry. Co. v. Buell*, 480 U.S. 557, 563 (1987) (describing judicial review of RLA adjustment board decisions as "among the narrowest known to the law").

Despite these concerns, two obstacles prevent this Court from accepting Ms. Ratfield's view of RLA preemption. First, although this Court sees merit in the approaches adopted by the Third, Fifth, Sixth, and Seventh Circuits, the law of the Eighth Circuit Court of Appeals is binding here. And Eighth Circuit law, specifically as articulated in *Boldt*, 904 F.3d at 592, and *Johnson*, 949 F.3d at 416–17, compels finding that Ms. Ratfield's claims are preempted under the RLA. In both of those cases, an active and genuine dispute over CBA terms affecting whether the plaintiff was qualified required preemption.

Second, although she disclaims that interpretation of the CBA will be necessary, Ms. Ratfield contests Delta's construction of several terms in her Contract A. As a result, this case involves more of an active dispute over CBA terms than there are in the out-of-circuit cases she cites. And in her complaint, Ms. Ratfield challenges several of Delta's actions as violating specific terms in the CBA. [*See, e.g.*, Compl. ¶ 73 (her PEth test was given in a "non-standard time frame"); *id.* ¶ 74 (Delta did not rerun her positive test or provide an opportunity for a confirmatory test in violation of its policies); *id.* ¶ 76 (Delta told her not to obtain additional new tests in violation of the Substance Abuse Policy); *id.* ¶ 124 (requiring her to sign a Contract B violated the CBA). This makes her claim more intertwined with disputes over what the CBA required rather than a mere dispute about unequal treatment. For these reasons, the Court finds that Ms. Ratfield's claim for gender discrimination is precluded by the RLA. Therefore, it **GRANTS** Delta's Motion to Dismiss to the extent it claims that the RLA divests the Court of jurisdiction over Ms. Ratfield's Title VII claim of gender discrimination.

**Retaliation**

The Court comes out differently on Ms. Ratfield's retaliation claims under Title VII and state law because those claims are different in meaningful ways. To start, the elements she must prove to establish a prima facie case of retaliation differ from those needed to prove gender discrimination.[8] She must show that "(1) [s]he engaged in protected conduct, (2) [s]he suffered a materially adverse employment action, and (3) the adverse action was causally linked to the protected conduct." *Pye v. Nu Aire, Inc.*, 641 F.3d 1011, 1021 (8th Cir. 2011) (citing *Fercello*, 612 F.3d at 1077–78)). Thus, the dispute over Ms. Ratfield's qualifications with respect to the Contract A terms described above is irrelevant to her retaliation claims. "Unlike [] discrimination claims, retaliation claims do not require a plaintiff to show [she] 'was meeting the legitimate expectations of the employer.'" *Johnson*, 949 F.3d at 413 (quoting *Clegg v. Arkansas Dep't of Corr.*, 496 F.3d 922, 926 (8th Cir. 2007)).

Courts generally treat retaliation claims and discrimination claims differently when it comes to RLA preemption based on this distinction. The Supreme Court has twice held that retaliation claims were not preempted under the RLA/LMRA framework. In *Hawaiian Airlines*, the plaintiff brought a state-law retaliatory discharge claim against his employer after he was terminated soon after reporting safety concerns to the Federal Aviation Administration. 512 U.S. at 249. In *Lingle*, the plaintiff sued for retaliatory discharge because he was fired soon after filing a state worker's compensation claim. 486 U.S. at 401. In both

---

[8]     Retaliation claims under Title VII and the MHRA are generally "governed by the same standards." *Fercello v. Cnty. of Ramsey*, 612 F.3d 1069, 1074 n. 2 (8th Cir. 2010); *but see Liles v. C.S. McCrossan, Inc.*, 851 F.3d 810, 819 (8th Cir. 2017) (discussing that the Minnesota courts haven't addressed whether but-for causation applies to retaliation under the MHRA).

cases, the Supreme Court found the state-law retaliatory discharge claims were not preempted because determining whether the employer had terminated the employees in retaliation for their protected conduct "depended upon purely factual questions concerning the employee's conduct and the employer's motive." *Hawaiian Airlines*, 512 U.S. at 251–52 (citing *Lingle*, 486 U.S. at 407). The Eighth Circuit has, on several occasions, found retaliation claims to escape RLA preemption based on identical reasoning. *E.g.*, *Markham*, 861 F.3d at 758 (citing *Lingle*, 486 U.S. at 410); *Sturge*, 658 F.3d at 837–38 (retaliation claim under ERISA not preempted even where plaintiff agreed his termination was "proper under the CBA"); *Dunn v. Astaris, LLC*, 292 F. App'x 525, 527 (8th Cir. 2008) (per curiam); *see also Meyer*, 163 F.3d at 1051 ("A number of our cases have also held that state-law retaliatory discharge claims are not preempted by the LMRA, because they turn on purely factual questions about the employer's conduct and motives rather than on the scope of the employer's contractual authority to discharge employees.").

So, too here. Ms. Ratfield alleges that she was threatened with termination, suspended, and forced to undergo retreatment, and had her leave manipulated to result in demotion, and that Delta took these actions *because of* her complaints about gender discrimination and sexual harassment. [Compl. ¶¶ 75–85, 128–31, 140–44, 150–57.] Although terms of the CBA likely will be relevant to the Court's inquiry in evaluating her retaliation claims, consulting the CBA does not "conclusively resolve[]" whether the adverse actions Ms. Ratfield complains about were motivated by a desire to retaliate against her. *Hawaiian Airlines*, 512 U.S. at 263. Assessing Delta's motives, and ultimately whether its nonretaliatory reason is pretextual, turns on "only the purely factual inquiry into any retaliatory motive" which is best suited for the ultimate trier

of fact to decide.  *Id.* at 266.  For these reasons, the Court **DENIES** Delta's Motion to Dismiss

to the extent it seeks dismissal of Ms. Ratfield's retaliation claims under Title VII and the

MHRA based on RLA preemption.

## IV. FAILURE TO STATE A CLAIM

Delta also moves for dismissal of Ms. Ratfield's claims under Rule 12(b)(6).  After its

assessment of Delta's preemption arguments, the remaining claims for this Court to evaluate

under the Rule 12(b)(6) rubric are her claims for retaliation under state and federal law, and

her claim of sexual harassment under the MHRA (which Delta does not argue is preempted).[9]

To survive Delta's Rule 12(b)(6) attack, Ms. Ratfield's complaint "must contain

sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'"

*Iqbal*, 556 U.S. at 678 (*quoting Twombly*, 550 U.S. at 570).  But the *Iqbal*/*Twombly* standard applies

a bit differently in employment discrimination cases.  The Supreme Court in *Swierkiewicz v.*

*Sorema*, 534 U.S. 506 (2002), "negated any need to plead a prima facie case" in these cases and

"emphasized that the prima facie model is an evidentiary, not a pleading, standard."

*Warmington v. Bd. of Regents of Univ. of Minn.*, 998 F.3d 789, 796 (8th Cir. 2021) (quoting *Blomker*

*v. Jewell*, 831 F.3d 1051, 1056 (8th Cir. 2016)).  The elements of the prima facie case are still

relevant in evaluating a Rule 12(b)(6) motion, of course, but they are more properly considered

---

[9]     The Court declines to find, as Ms. Ratfield contends, that Delta cannot raise a Rule
12(b)(6) challenge now because it did not do so in its first motion to dismiss.  In that motion,
Delta contended that the Eastern District of New York lacked jurisdiction over her original
complaint and that New York was an improper venue.  Now that this case is in the proper
venue and the Court has jurisdiction to consider the merits, the Court allows Delta to raise its
Rule 12(b)(6) argument.

"part of the background" of the plausibility determination or "as a prism to shed light upon the plausibility of the claim." *Blomker*, 831 F.3d at 1056 (quotation omitted).

The bottom line is that plaintiff "need not plead facts establishing a prima facie case . . . under *McDonnell Douglas* in order to defeat a motion to dismiss." *Benner v. Saint Paul Pub. Sch.*, Civil No. 17-01568 (SRN/KMM), 2017 WL 6001736, at *6 (D. Minn. Dec. 4, 2017) (quoting *Hager v. Ark. Dep't of Health*, 735 F.3d 1009, 1014 (8th Cir. 2013)). Under this "simplified notice pleading standard" for *McDonnell Douglas* claims, "summary judgment motions—not motions to dismiss—should dispose of most unmeritorious claims." *Wilson v. Ark. Dep't of Hum. Servs.*, 850 F.3d 368, 372 (8th Cir. 2017) (citing *Swierkiewicz*, 534 U.S. at 512). "The plaintiff's burden at the prima facie case stage of the analysis is not onerous." *Id.* (citation omitted).

### A. Retaliation

Under these standards, the Court finds that Ms. Ratfield has stated a plausible claim for retaliation under both Title VII and the MHRA. Again, the elements of a prima facie case of retaliation under both statutes are that Ms. Ratfield (1) engaged in protected conduct, and (2) suffered a material adverse action, with (3) a causal connection between the two. *Pye*, 641 F.3d at 1021. Delta does not challenge the first element in this motion. Instead, it contends that the adverse actions Ms. Ratfield complains of were actually "positive" opportunities Delta offered her under the CBA to save her job. [Def. Mem. 20–21.] The Court disagrees.

A material adverse action to support a retaliation claim means "a tangible change in working conditions that produces a material employment disadvantage." *Muldrow v. City of St. Louis*, 30 F.4th 680, 688 (8th Cir. 2022) (quoting *Clegg*, 496 F.3d at 926)); *see also Bahr v. Capella*

*Univ.*, 788 N.W.2d 76, 83 (Minn. 2010) (same).  Ms. Ratfield alleges that in retaliation for her complaints of unlawful gender discrimination and sexual harassment, she was (1) suspended and required to undergo substance abuse retreatment, unlike pilots who had not made such complaints; (2) threatened with termination through a Notice of Intent to Terminate based on falsities that was later withdrawn; and (3) demoted from Captain to First Officer, which had a direct adverse effect on her income.

Although Delta asks the Court to view these actions as beneficial opportunities authorized by the CBA,[10] binding caselaw indicates otherwise.  "A suspension is an adverse employment action."  *Charleston v. McCarthy*, 175 F. Supp. 3d 1115, 1124 (S.D. Iowa 2016) (citing *McClure v. Career Sys. Dev. Corp.*, 447 F.3d 1133, 1137 (8th Cir. 2006)).  "[B]ecause two of the written reprimands threatened termination. . . a reasonable juror could find that those reprimands, *on their own*, consisted 'adverse employment action.'"  *Benner v. St. Paul Pub. Schs., I.S.D. #625*, 380 F. Supp. 3d 869, 898 (D. Minn. 2019) (internal quotations omitted, emphasis in original).  And "demotion clearly [is] an adverse employment action."  *Gilbert v. Des Moines Area Cmty. Coll.*, 495 F.3d 906, 918 (8th Cir. 2007).  These allegations plausibly allege materially adverse employment actions taken by the Defendant.  Moreover, the Court declines Delta's implicit suggestion that, because it could have imposed harsher measures on Ms. Ratfield, the steps it did take cannot have been adverse.

---

[10]     Delta's argument runs headlong into another problem.  By asking the Court to view the actions it allegedly took in retaliation for Ms. Ratfield's protected conduct as nothing more than beneficial opportunities it extended to the plaintiff to save her job, it would have the Court take the inferences from the facts alleged in the Complaint in Delta's favor.  Maybe Delta will be able to convince a factfinder that its narrative carries the day, but granting a motion to dismiss on this basis turns Rule 12(b)(6) on its head.

Ms. Ratfield has also sufficiently alleged that there is a causal connection between her protected activity and the adverse employment actions. *See Liles v. C.S. McCrossan, Inc.*, 851 F.3d 810, 819 (8th Cir. 2017) (discussing that while retaliation under Title VII requires but-for causation, the Minnesota courts haven't yet addressed whether the same standard applies under the MHRA). Ms. Ratfield alleges that on December 12, 2019, she emailed Delta's Senior Vice President of Flight Operations reporting unfair and discriminatory treatment, *i.e.*, that Delta would not accept her secondary negative tests despite accepting them for male pilots. [Compl. ¶ 81.] Just two weeks later, her supervisor informed her "that she was [being] terminated." [*Id.* ¶ 85.] And in the same month that she emailed Delta's Ethics and Compliance Vice President reporting sexual harassment, gender discrimination, and retaliation, her supervisor allegedly backdated her time from administrative leave to sick time, which resulted in her subsequently being demoted to First Officer. [*Id.* ¶¶ 88, 128.]

Although the Eighth Circuit generally requires more, temporal proximity between the protected activity and adverse action may be sufficient to create an inference of retaliation. *Wright v. St. Vincent Health Sys.*, 730 F.3d 732, 738 (8th Cir. 2013); *see also Wilson*, 850 F.3d at 373 (finding a six-week period between the protected conduct and adverse action to plausibly allege a but-for causal connection.) And in addition to temporal proximity, Ms. Ratfield also alleges comments and conduct that support an inference of a retaliatory motive, such as Dr. Kozarsky's statement that Ms. Ratfield "really rubbed some people the wrong way" at Delta and that this is "the good ol' boys club after all," or that her supervisors sent a positive test from an unknown source to the treatment facility in an alleged attempt to sabotage her from reobtaining her flying license. [Compl. ¶¶ 106–13.] Delta contends that Ms. Ratfield is

unable to establish causation for her retaliation claim as a matter of law because the Federal Aviation Administration revoked Ms. Ratfield's FCMC.  But pilots who remain employed by Delta as they contest the FAA's decision or work toward obtaining or regaining a special issuance FCMC are still entitled under federal law to be free from retaliation.  And Ms. Ratfield at this stage is not required "to rule out every possible lawful explanation for the conduct [she] challenges" as that "would impose the sort of probability requirement at the pleading stage which *Iqbal* and *Twombly* explicitly reject."  *Wilson*, 850 F.3d at 373 (quoting *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 597 (8th Cir. 2009)).  Delta is free to raise similar arguments at the summary judgment stage, after discovery. For the foregoing reasons, Ms. Ratfield has stated a claim for retaliation under Title VII and the MHRA, so Delta's Motion to Dismiss is **DENIED** to the extent it claims Ms. Ratfield failed to state a claim for retaliation.

### B. Hostile Work Environment

The only remaining claim is Count Four, in which Ms. Ratfield alleges that she was subject to sexual harassment throughout her employment with Delta in violation of the MHRA.  The purpose of the MHRA is "to secure for persons" in Minnesota "freedom from discrimination . . . in employment because of . . . sex."  Minn. Stat. § 363A.02, subd. 1(a)(1). The MHRA is a remedial act that "shall be construed liberally."  Minn. Stat. § 363A.04.  The Minnesota Legislature amended the MHRA in 1982 to make clear that sexual harassment is a form of sex discrimination.  *Rasmussen v. Two Harbors Fish Co.*, 832 N.W.2d 790, 795 (Minn. 2013) (citing Minn. Stat. § 363A.03).  Sexual harassment is defined as "unwelcome sexual advances, requests for sexual favors, sexually motivated physical contact or other verbal or physical conduct or communication of a sexual nature" that "has the purpose or effect of

substantially interfering with an individual's employment" or "creating an intimidating, hostile, or offensive employment."  Minn. Stat. § 363A.03, subd. 43.

Minnesota courts generally rely on federal law interpreting Title VII to guide their interpretation of the MHRA's prohibition on sexual harassment.  But this reliance "has not been absolute."  *Kenneh v. Homeward Bound, Inc.*, 944 N.W.2d 222, 229 (Minn. 2020).  The MHRA has historically "provided more expansive protections to Minnesotans."  *Id.* at 299 & n.2 (describing differences between federal and state law in this area).  And while Minnesota has imported the severe-or-pervasive standard from federal law, the Minnesota Supreme Court clarified that decisions by federal courts regarding whether harassment is sufficiently severe or pervasive enough to be actionable are not binding.  That is because the standard for unlawful sexual harassment in Minnesota "evolve[s] to reflect changes in societal attitudes towards what is acceptable behavior in the workplace."  *Id.* at 231.  "Today, reasonable people would likely not tolerate the type of workplace behavior that courts previously brushed aside."  *Id.* (citing Eighth Circuit cases finding conduct inappropriate but not actionable.)  And generally, the Minnesota Supreme Court has stated that whether alleged harassment is sufficiently severe or pervasive is a question of fact for the jury, and not for a court to decide on summary judgment, let alone on the pleadings.  *Id.* at 232 (quoting *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 901 (7th Cir. 2018)).

Ms. Ratfield's complaint contains allegations of sexual harassment that are severe or pervasive enough to be actionable under the MHRA.  She alleges that she was groped on the job; asked out on a date by her training manager and received a false negative report after rejecting his advances; was called a "princess" and too "girly" by a supervising captain;

repeatedly given a gesture by a male pilot that insinuates the placing of two fingers inside of a vagina and one finger simultaneously in the anus; had a supervisor brag to other supervisors about seeing her breasts while she was breastfeeding; and had her direct supervisor use the sexually offensive term "camel toe" to describe the fit of her pilot unform.   [Compl. ¶ 46 (groped); ¶ 40 (asked out); ¶ 45 (princess); ¶ 41 (finger gesture); ¶ 43 (breastfeeding); ¶ 47 (camel toe).]   Critically, Delta was aware of these incidents, as Ms. Ratfield continuously reported them immediately after they happened, allegedly to no avail.   These instances of sexual harassment, though perhaps of the type brushed off by courts in different eras, comprise the sort of workplace behavior today that reasonable people "likely would not tolerate." *Kenneh*, 944 N.W.2d at 231.

The potential problem for Ms. Ratfield is whether the Court may consider all of these instances of harassment because many are untimely.   The MHRA requires an individual to file a charge of sexual harassment with the Minnesota Department of Human Rights or file a claim in court within "one year after the occurrence."   Minn. Stat. § 363A.28, subd. 3(a).   Although Ms. Ratfield filed three charges with the Minnesota Department of Human Rights, only in her last one, on June 8, 2021, did she allege sexual harassment.   [*See* MDHR Charges, Ex. 12–14, Dkt. No. 43.]

Ms. Ratfield's complaint includes two allegations of harassment that occurred within one year of her June 2021 charge.   First, she alleges that on a flight in March 2021, she got up to stretch her back, a male pilot asked her if her back hurt, another male pilot asked if she had tried an inversion table, and one of the pilots remarked to the group that he would "like to see [his] wife inverted every morning."   [Compl. ¶ 136.]   Second, in April 2021, she alleges that a

Delta captain approached her, looked her up and down in a lewd manner, including staring directly at her breasts. [*Id.* ¶ 138.] He remarked after shaking her hand that she has "such a strong handshake" and "must be a bodybuilder," and then he continued to look at her up and down in a lewd manner. [*Id.*] These instances, on their own, likely do not suffice as actionable harassment under the MHRA.

But Ms. Ratfield checked off the "continuing action" box on her MHRA charge that alleged sexual harassment, so she contends that the Court may consider the harassment that occurred before June 2020 under the continuing violation doctrine. Under Minnesota law, the continuing violation doctrine tolls the MHRA's one-year statute of limitations and enables a court to consider a series of related acts of sexual harassment if the harassment "manifests itself over time." *Costilla v. State*, 571 N.W.2d 587, 593 (Minn. Ct. App. 1997) (quotation omitted). Under the continuing violation doctrine, Ms. Ratfield just needs to show "that at least one incident of harassment occurred within the limitations period." *Id.* (quotation omitted). But "discrete acts" within the statute of limitations "do not make timely acts that fall outside the time period," because a discrete act of discrimination is its own unlawful employment practice that resets the clock. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002).

Importantly, hostile environment claims are "by nature analyzed differently" than claims of discrimination "based on discrete acts." *Abel v. Abbott Nw. Hosp.*, 947 N.W.2d 58, 71 n.5 (Minn. 2020). This is because they are "are different in kind" from discrete acts of discrimination. *Morgan*, 536 U.S. at 115; *see also Abel*, 947 N.W.2d 58, 71 n.5. Hostile work environment claims are "based on the cumulative effect of individual acts" and may occur

over a series of years. *Morgan*, 536 U.S. at 115. This "series of separate acts" constitutes "one unlawful employment practice." *Id.* at 116. "Only the smallest portion of that 'practice' needs to occur within the limitations period for the claim to be timely." *Jensen v. Henderson*, 315 F.3d 854, 859 (8th Cir. 2002). For these reasons, the Minnesota Supreme Court has noted that "the continuing violations doctrine is particularly relevant in hostile environment claims" and suggested that "a hostile work environment claim, by nature, constitutes a continuing violation." *Abel*, 947 N.W.2d at 71 n.5 (quotation omitted).

Timeliness under the MHRA is an affirmative defense, and it is Delta's burden to establish. *Abel*, 947 N.W.2d at 71–72. The Court finds that Delta has not met its burden in establishing that Ms. Ratfield did not plausibly allege a continuing violation of a hostile work environment. Reasonable inferences must be drawn in her favor at this preliminary stage. The Court also notes the conflicting interplay between the severe-or-pervasive standard and the continuing violation doctrine in hostile work environment claims: while the plaintiff must wait until the pattern of harassment is severe or pervasive enough to sue, the court is not required to apply the continuing violations doctrine and consider the untimely acts that *made* the pattern severe or pervasive enough. *See* Lisa S. Tsai, *Continuing Confusion: The Application of the Continuing Violation Doctrine to Sexual Harassment Law*, 79 Tex. L. Rev. 531, 538 (2000).

On the face of the pleadings, the Court concludes that Ms. Ratfield has plausibly alleged that while working as a Delta pilot, she was subjected to, and made Delta aware of, a sexually hostile work environment emblematic of "the good ol' boys club." [Compl. ¶ 106.] That is all that is required at this stage. *See Fergus v. Minn. Off. of Higher Educ.*, File No. 22-cv-1130 (ECT/DTS), 2022 WL 5196148, at *4 (D. Minn. Oct. 5, 2022) (holding that whether a plaintiff

can establish a continuing violation claim regarding a hostile work environment is "not appropriately considered on a motion to dismiss."). Delta's Motion to Dismiss is **DENIED** to the extent it seeks dismissal of Ms. Ratfield's sexual harassment claim for failure to state a claim.

## V. ORDER

For the foregoing reasons, **IT IS HEREBY ORDERED** that Delta's Motion to Dismiss [Dkt. No. 39] is **GRANTED in part** and **DENIED in part.**

1. Delta's motion is granted to the extent it seeks dismissal of Ms. Ratfield's claim of gender discrimination under Title VII for lack of subject matter jurisdiction. Ms. Ratfield's gender discrimination claim is precluded by the RLA because it substantially depends on an interpretation of specific provisions of her CBA. Accordingly, Count Three is dismissed without prejudice.

2. Delta's motion is denied to the extent it seeks dismissal of Ms. Ratfield's claims of retaliation under Title VII and the MHRA for lack of subject matter jurisdiction. These claims are not preempted by the FAA or the RLA.

3. Delta's motion is denied to the extent it seeks dismissal for failure to state a claim. Ms. Ratfield has plausibly pleaded a claim for retaliation under Title VII and the MHRA and sexual harassment under the MHRA.

Date: August 11, 2023

_s/ Katherine Menendez_
Katherine Menendez
United States District Judge